**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JAMES A. VADEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:12-cv-105** |
| | ) | |
| **DEKALB TELEPHONE** | ) | **Judge Sharp** |
| **COOPERATIVE, INC. AND** | ) | |
| **CRAIG GATES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **KEVIN C. YOUNG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:12-cv-106** |
| | ) | |
| **DEKALB TELEPHONE** | ) | **Judge Sharp** |
| **COOPERATIVE, INC. AND** | ) | |
| **CRAIG GATES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

Plaintiffs Kevin Young and James Vaden[1] claim that their employer, Defendant DeKalb

Telephone Cooperative, and the company's CEO, Defendant Craig Gates, terminated them in

violation of the federal Employee Retirement Income Security Act and Tennessee common law.

---

[1] Plaintiffs Kevin Young and James Vaden filed two separate cases. Although they are not consolidated, the two cases are similar in all material respects and parallel motions are pending in each case. As a result, this memorandum and the accompanying order will address both cases. Unless noted otherwise, docket references are to *Young v. Dekalb Telephone Cooperative, Inc. et al*, No. 2:12-cv-106. The Court will clearly identify the few references to docket entries in *Vaden v. Dekalb Telephone Cooperative, Inc. et al*, No. 2:12-cv-105.

Pending before the Court are several motions, including three cross-motions for summary judgment and two motions to strike.

## **BACKGROUND**

The line-crew employees of DeKalb Telephone Cooperative (DTC) install, service, and remove copper-containing telecommunications cables and wires in several Tennessee communities. (Docket No. 60 at 1). Plaintiff Kevin Young worked on the line crew from February 2000 until some point in 2009, when he took another position at DTC. Plaintiff James Vaden began working for DTC on the line crew in September 1997. (*Vaden*, No. 2:12-cv-105, Docket No. 51 at 2). DTC terminated both men in April 2012 in the wake of a copper-theft scandal that rocked the company in late 2011. This was just a few months after DTC's new CEO, Craig Gates, came on board and discovered disorder in the house. (Docket No. 60 at 2).

The scandal unfolded when the DeKalb County Sherriff's Office arrested Tom Ervin, a member of DTC's line crew, as he hauled a trailer full of DTC copper to a local scrap yard. (*Id.* at 3). Although DTC officials knew as early as May 2010 that employees might be stealing copper, (Docket No. 55 at 1), the company did not move on this information until after Ervin's arrest in December 2011. At around that time, Gates questioned two other employees—Dale Myers, DTC's Outside Plant Manager, and Luke Judkins, a line-crew member—about the copper theft. (Docket No. 40-2 at 2–3). Judkins eventually admitted to stealing copper on one occasion in 2007, and Myers copped to sharing in proceeds from its sale. (*Id.*). Gates terminated both men.

Steve Johnson took over Myers's position as Outside Plant Manager. On Johnson's first day in his new role, Eddie Summers, a longtime DTC lineman, told Johnson that copper theft was widespread at DTC. (*Id.* at 4). Johnson brought Gates into the discussion and Summers

related to them that he "believed that everyone on the line crew had knowledge of the copper theft and had partaken in the scheme." (Docket No. 44 at 2).

Spurred to action, Gates set about interviewing several current and former linemen, including Sammy Malone, Nick Sircy, Greg Fish, John Hale, and Plaintiffs Young and Vaden. (Docket No. 40-2 at 4). Sircy and Malone denied any involvement with or knowledge of copper theft. (*Id*. at 5). Fish and Hale both admitted to taking money from the sale of DTC copper in 2007. Both parties agree on that point.

Much harder to discern is what Plaintiffs Young and Vaden did or did not admit to. On the one hand, Gates stated in his deposition that Young admitted to him on March 29, 2012, that Young "received $700 for the sale of copper given to [Young] from Dale Myers." (*Id*.). On the other, the statement Gates had Young write out admitting this doesn't connect the money Young received to the proceeds from the stolen copper quite so tightly. The statement—written and signed on the same day—reads: "Approximately 6 years ago I along with Eddie, Tony [Vaden] [] was told to take down cable along a route out of Smithville. After we tore it down we loaded it into the truck as we did with any cable and I don't know where it was taken but I received approximately 700 dollars from Dale Myers." (Docket No. 40-4 at 1). As Young points out, his written statement is not exactly an admission that he received funds from the sale of copper.

Gates pulled Plaintiff Vaden into a meeting on that same day in March 2012. Their opposing accounts of what was said cannot be squared. Gates says in a declaration that Vaden

> admitted to receiving around $700 from Kevin Young, but he maintained that the money came from God and was a blessing. Vaden continued to insist the money "came from God," and he described other improbable circumstances when he believed God had given him other money and even one occasion when God blessed him with a very large farm. These explanations did not ring true and seemed like an evasion. I continued to question him and Vaden finally admitted that if he had to "suppose," he would say the money came from copper.

(*Vaden*, No. 2:12-cv-105, Docket No. 44 at 5).  In his own deposition, Vaden denied every last bit of Gates's account:

> Q.    Okay.  Did you ever get money from copper?
> A.    No, sir.
> Q.    Somebody give you $700 one time?
> A.    No, sir.
> Q.    No?
> A.    No, sir.

(*Vaden*, No. 2:12-cv-105, Docket No. 57-2 at 2–3).  Vaden added: "[I]t's like I told Mr. Gates when we had the meeting:  I never sold no copper, I never seen nobody sell it, and I never took any money from it."  (*Id*. at 4).

Gates conferred with DTC's lawyers about what to do with the five linemen whom he believed had stolen scrap copper from DTC or received money from its sale.  Gates presented Summers with an agreement that required him only to repay DTC the value of the copper he admitted to taking.  Summers took the deal and kept his job.  (Docket No. 44 at 2–3).  To the remaining men—Hale, Fish, and Plaintiffs Young and Vaden—Gates served up a less generous offer.  He gave them a written "Agreement of Suspension" that required each one to accept a suspension without pay for six weeks; the suspension of employee benefits available to him; and, after coming back from the suspension, a 10% pay cut and reduced benefits equal to those of a new hire.  As to its impact on benefits, the agreement states:

> 6.  Any benefits of employment available to Employee by DTC shall not accrue during the suspension.  The Employee shall have the choice to elect a continuation of coverage of health benefits that he is currently receiving, per COBRA, during the suspension period.  Upon return to employment with DTC after fully completing the suspension terms herein, the Employee shall be considered a "new hire" for benefits that are available to him on a going forward basis with DTC[.]

(Docket No. 38-1 at 3).

Hale and Fish signed the Agreement of Suspension and later returned to work at DTC. Plaintiffs Young and Vaden, however, would not accede to its terms. Because both men refused to sign the Agreement of Suspension, DTC terminated their employment. In all, DTC terminated five individuals in the course of the copper-theft investigation, but did not hire replacements for any of their positions. (Docket No. 38-2 at 8 & 12).

At the time DTC dismissed Young and Vaden, the company offered its employees participation in a multi-employer defined contribution pension plan and a 401(k) retirement savings plan; healthcare benefits; disability benefits; life insurance; dental benefits; and severance pay. (Docket No. 38-6 at 2–19) (sealed docket entry). Vaden sent a letter to DTC after he was terminated asking about his severance benefits. (Docket No. 38-7 at 2). DTC, however, did not respond because Gates determined Vaden was ineligible. (Docket No. 38-2 at 6–8). Young, seeing how DTC handled Vaden's severance claim, decided that submitting a written claim for severance pay would be futile. (Docket No. 39 at 2). Neither man has received severance benefits from DTC.

Young and Vaden each sued DTC and Craig Gates in November 2012, raising four claims. (Docket No. 1 at 8–13; *Vaden*, No. 2:12-cv-105, Docket No. 1 at 8–13). In Count I, they allege that DTC wrongfully denied them severance benefits, in violation of Section 502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B). In Count II, Young and Vaden claim that Gates's failure to establish a procedure for DTC employees to make and adjudicate severance claims breached his fiduciary duty as the administrator of the severance plan, in violation of ERISA Sections 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2)

& (3). In Count III, the men maintain that Gates violated ERISA Section 510, 29 U.S.C. §1140, because he terminated them for the purpose of interfering with their attainment of pension, severance, and other employee benefits, as well as in retaliation for exercising their rights under ERISA. Finally, in Count IV, Plaintiffs say they were wrongfully terminated in violation of Tennessee's common-law rule that an at-will employee cannot be discharged for any reason that violates public policy; here, they say, Gates terminated them because they refused to accede to his extortionate demands, which they contend is an impermissible ground for discharge. Both Plaintiffs and DTC move for summary judgment on Counts I, II, and III. DTC alone seeks judgment as a matter of law on Count IV.

## LEGAL STANDARD

A party may obtain summary judgment if the evidence establishes that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question is whether any genuine issue of material fact is in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported summary-judgment motion, the nonmoving party must set forth specific facts that show a genuine issue of material fact for trial. If the party does not do so, summary judgment may be entered. Fed. R. Civ. P. 56(e). The nonmoving party's burden to point to evidence demonstrating a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477

U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When ruling on cross motions for summary judgment, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

## ANALYSIS

### Count I: Wrongful denial of severance benefits, § 502(a)(1)(B)

Both parties move for summary judgment on Plaintiffs' denial-of-benefits claim, which asserts that DTC wrongly denied them benefits they are entitled to under DTC's severance-pay policy. That policy, found in DTC's Employee Handbook, provides:

> A. It is the policy of the Cooperative to grant severance pay to terminated employees under certain circumstances in order to provide them with income while seeking other employment.
>
> B. An employee is eligible for severance pay if he/she is permanently terminated after one year of full-time service because of:
>
>> 1. A reduction in the Cooperative['|s work force.
>>
>> 2. Elimination of job or position.
>
> C. An employee will not be eligible for severance pay if he or she:
>
>> 1. Leaves the Company voluntarily.
>>
>> 2. Is terminated for misconduct.
>>
>> 3. Is laid off for a period of less than thirty (30) days.
>>
>> 4. Retired from the Cooperative under conditions not involving elimination or termination of the job.
>
> D. The amount of severance pay shall be one week['s] regular straight-time pay for each full year of continuous service.

(Docket No. 37-1 at 1).

As the parties recognize, however, deciding this issue first requires the Court to determine whether the severance-pay policy is an employee benefit plan subject to regulation under ERISA. Only if it is can the Court then answer whether Young and Vaden are entitled to benefits under it. "Determining the existence of an ERISA plan is a question of fact to be answered in light of all the surrounding circumstances and facts from the point of view of a reasonable person." *Kolkowski v. Goodrich Corp.*, 448 F.3d 843, 847 (6th Cir. 2006).

"ERISA defines an employee benefit welfare plan as 'any plan . . . established or maintained by an employer, for the purposes of providing for its participants . . . (A) benefits in the event of . . . unemployment . . . or (B) any benefit described in section 186(c) of this title.'" *Id*. at 848 (quoting 29 U.S.C. § 1002(1)). And "[s]ince severance plans are included in the definition of 29 U.S.C. § 1002(1)(B) they may be considered an ERISA benefits plan." *Id*. (citing *Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 615 (6th Cir. 2002)). But "'not all severance pay plans are ERISA plans.'" *Id*. (quoting *Cassidy*, 308 F.3d at 616). "The hallmark of an ERISA benefit plan is that it requires 'an ongoing administrative program to meet the employer's obligation.'" *Swinney v. Gen. Motors Corp.*, 46 F.3d 512, 517 (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987)). The Sixth Circuit uses "two particular factors to determine if a severance agreement plan meets the *Fort Halifax* criteria to determine if ERISA governs: 1) whether the employer has discretion over the distribution of benefits, and 2) whether there are on-going demands on an employer's assets" due to the delivery of severance benefits. *Kolkowski*, 448 F.3d at 848. With respect to the first factor, the "determining characteristic of administrator discretion [is] whether the plan administrator ma[k]e[s] individualized determinations of eligibility, as opposed to those that require automatic or simple decisions." *Id*.

The parties differ sharply as to whether DTC's severance-pay policy evinces these characteristics. As to discretion, Plaintiffs point out that the Plan requires DTC to make various discretionary determinations when considering a participant's entitlement to benefits, including whether a participant committed misconduct that disqualifies him from severance pay; absent a definition of "misconduct," they reason, the plan administrator exercises complete discretion to determine activities that constitute a disqualifying offense. (Docket No. 37 at 7–8). In addition, Plaintiffs say, DTC retains authority to determine whether an employee met the full-time requirement and whether an employee separated from DTC due to a reduction in force or the elimination of his or her position. (*Id.*). DTC does not address Plaintiffs' point about the definition of disqualifying misconduct, and instead argues that any eligibility determinations under the policy are "simple" and "mechanical" questions concerning whether the prerequisite reduction in force or job elimination occurred. (Docket No. 54 at 6–7 (quoting *Cassidy*, 308 F.3d at 616)).

DTC's response is question-begging, though, since the severance-pay policy's failure to flesh out the meaning of these terms leaves DTC with wide latitude to interpret their meaning. So it is unsurprising that the parties spar over how to characterize what happened to Young and Vaden: the duo contend that DTC thinned out its workforce during the copper-theft investigation to deal with its weak financial position, eliminating positions for which DTC did not rehire; DTC maintains there was no reduction in force and that the company simply terminated the two men for misconduct. But the policy provides no objective criteria to hem in DTC's ability to define what amounts to "misconduct" or how an elimination of a job or position is distinct from a termination of an employee from a job or position that the company does not refill. Given that, "[i]ndividualized analysis of the cause of the employee's termination requires discretion."

*Barrow v. Aleris Intern., Inc.*, 2007 WL 3342306, at *4 (W.D. Ky. 2007) (citing cases).  The

Court is hard-pressed to conclude, as DTC would have it, that the severance-pay policy requires

no relevant discretionary judgments and merely "involve[s] [s]imple or mechanical

determinations."  *Cassidy*, 308 F.3d at 614 (internal quotation marks omitted; second alteration

in original).  The discretion factor weighs in favor of finding that the policy is an ERISA plan.

However, the second factor—whether the severance-pay policy places on-going demands

on DTC's assets, *Kolkowski*, 448 F.3d at 848—is a different story and spells doom for Plaintiffs'

denial-of-benefits claim.  Young and Vaden make three attempts to show this factor tilts toward

them, none of them convincing.  First, they say, ERISA requires a plan administrator to establish

a reasonable claims procedure for processing benefits claims and that this claims procedure itself

is an ongoing administrative burden that places ongoing demands on DTC's assets.  (Docket No.

37 at 8–9).  The trouble with this argument is that there is no evidence that DTC has *any* claims

procedure related to its severance policy.  Indeed, the absence of such a procedure is linchpin of

Plaintiffs' separate breach-of-fiduciary-duty claim.  (*See* Docket No. 37 at 13 ("In this case,

[Plaintiffs'] breach of fiduciary duty claim is premised on Defendants' failure to establish a

reasonable claims procedure, as required by ERISA."); *see also id*. at 14 ("Finally, there is no

dispute that Defendants have no established claims procedure in administering the Plan, let alone

a procedure that comports with the requirements of 29 U.S.C. § 1133 and the implementing

regulations.")).

Plaintiffs' second stab at showing an ongoing demand on company assets proves too

much.  They argue that because eligibility for severance benefits necessarily affects a

participant's entitlement to other benefits—such that DTC's decision concerning a beneficiary's

severance pay may affect, for example, whether the company will offer him COBRA

continuation coverage or challenge his application for state unemployment benefits—a decision to approve or deny severance pay necessarily creates additional, ongoing financial burdens on DTC. (*Id*. at 9). If that were true, then every severance scheme would satisfy this factor, and litigants would only have to show that an employer has discretion over the distribution of severance benefits to demonstrate that a severance policy is an ERISA plan. But "not all severance pay plans are ERISA plans." *Cassidy*, 308 F.3d at 616. And the Sixth Circuit is clear that courts must "use[] *two* particular factors to determine if a severance agreement plan" is subject to ERISA. *Kolkowski*, 448 F.3d at 848 (emphasis added). To maintain, as Plaintiffs do, that every severance plan necessarily creates ongoing financial burdens on a company because any severance-related decision bears on the firm's other employee benefit obligations is to read the second factor out of the *Kolkowski* analysis. The Court is not at liberty to do that.

The Court can make short work of Plaintiffs' third and final ongoing-demand argument. Young and Vaden posit that DTC's balance sheets include line items for post-retirement and other benefits, leaving "little doubt" that the severance-pay policy creates a demand on DTC's finances that require its "'coordination and control.'" (Docket No. 37 at 9 (quoting *Cassidy*, 308 F.3d at 616)). While DTC's balance sheet no doubt has line items that include the words "postretirement benefits," Plaintiffs offer no evidence that this category includes severance-pay funds. On top of that, Young and Vaden admit that "DTC does not maintain a separate fund" to pay for severance benefits. (Docket No. 60 at 11). With no evidence of a funding source— either a separate one or one pooled to fund several benefits that include severance pay—Young and Vaden cannot show the severance pay policy places an ongoing demand on DTC's assets.

The failure to show that DTC has "an ongoing administrative program" to run its severance-pay policy is fatal to Plaintiffs' claim that ERISA governs that policy. This is true

even if the discretion factor tilts in Plaintiffs' favor, since "[t]he hallmark of an ERISA benefit plan is that it requires 'an ongoing administrative program to meet the employer's obligation,'" *Swinney*, 46 F.3d at 517 (quoting *Fort Halifax*, 482 U.S. at 11).  And with no ERISA plan, Plaintiffs' denial-of-benefits claim cannot stand.  The Court grants DTC's summary-judgment motion on Count I, and denies Plaintiffs' cross-motion on the same claim.

**Count II:  breach of fiduciary duty with respect to the severance plan, §§ 502(a)(2) & (a)(3)**

Both parties also move for summary judgment on Count II, in which Plaintiffs allege that DTC's failure to establish a reasonable claims procedure for severance-pay benefits breached the company's fiduciary duty under ERISA to "provide for a procedure for informing participants in a timely fashion of the time periods for decisions on claims made and the time periods for making appeals and receiving decisions thereon."  *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 414 (6th Cir. 1998) (citing 29 C.F.R. § 2560.503-1(b)(1)(iv)).

The Court's conclusion as to Count I dooms Count II as well.  Because the severance-pay policy is not an ERISA plan, the procedural requirements Plaintiffs allege violations of do not apply.  As a result, the Court grants DTC's summary-judgment motion on Count II, and denies Plaintiffs' motion on the same claim.

**Count III:  interference with attainment of benefits, § 510**

The parties next move for summary judgment on Count III, in which Young and Vaden claim that Gates interfered with their attainment of benefits and retaliated against both men for exercising a protected right by putting them to the choice of taking a cut in pay and benefits under false pretenses, or being fired and denied future benefits.  The Court will first consider DTC's summary-judgment motion on Count III before attending to Plaintiffs' cross-motion.

*DTC's summary-judgment motion*

ERISA § 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for [1] exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for [2] the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]" 29 U.S.C. § 1140. "Thus, the Sixth Circuit recognizes two types of claims under this section: (1) an exercise or retaliation claim, such as the present suit, where adverse action is taken because a participant availed [him]self of an ERISA right; and (2) an interference claim where adverse action is taken as interference with the attainment of a right under ERISA." *Hamilton v. Starcom Mediavest Grp., Inc.*, 522 F.3d 623, 627–28 (6th Cir. 2008) (internal quotation marks omitted). Plaintiffs maintain that DTC's wrongful acts violate both clauses.

*Interference claim*

The Court begins with the interference claim. "To defeat summary judgment, the plaintiffs must show that [DTC] fired them for the purpose of interfering with the attainment of their retirement benefits. Plaintiffs may make this showing either through direct or circumstantial evidence, with the latter via the ubiquitous burden-shifting framework that has, like some B-movie villain, devoured nearly every area of law with which it has come into contact." *Crawford v. TRW Auto. U.S. LLC*, 560 F.3d 607, 613 (6th Cir. 2009) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)) (citations omitted). Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Schweitzer v. Teamsters Local 100*, 413 F.3d 533, 537 (6th Cir. 2005) (internal quotation marks and citation omitted). Although Plaintiffs make passing reference to

their reliance on direct evidence—arguing that the very terms of the Agreement of Suspension, as well as Gates's admission that he terminated Plaintiffs because they refused to sign the Agreement of Suspension, are direct evidence of DTC's discriminatory intent—the Court does not think Plaintiffs have presented any. That said, the circumstantial evidence they offer up does the trick and is sufficient to get their claims to a factfinder.

"In the ERISA context, the burden-shifting framework first requires the plaintiffs to establish their 'prima facie' case by showing the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Crawford*, 560 F.3d at 613 (internal quotation marks omitted). "'[P]rima facie' is *Burdine/McDonnell Douglas patois* for the fact that the plaintiffs have shown enough to create a rebuttable presumption such that the employer must then produce evidence supporting a legitimate, non-discriminatory reason for the discharge." *Id*. at 613–14. Once an employer makes this showing, "the burden shifts back to the plaintiff to show that this proffered reason was a 'pretext'—i.e. a phony reason—and instead that the intent to interfere with the plaintiff's ERISA rights was a 'motivating factor.'" *Id*. at 614.

"A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one," *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1114 (6th Cir. 2001), and Plaintiffs have met it here. Plaintiffs allege that DTC engaged in prohibited conduct when it put them to the choice of acquiescing to the terms of the Agreement of Suspension or losing their jobs. DTC presented them with the Agreement of Suspension, they say, to prevent them from getting various employee benefits to which they were entitled.

The plain terms of the Agreement—"[a]ny benefits of employment available to Employee by DTC shall not accrue during the suspension," and further, "the Employee shall be

considered a 'new hire' for benefits that are available to him on a going forward basis with DTC," (Docket No. 38-1 at 3)—support Plaintiffs' contention. Under the Agreement, Plaintiffs reasonably understood that they would get fewer benefits with respect to those plans in which benefits levels are tied to years of seniority, wages rates, or both. DTC's retiree health plan, for example, subsidizes coverage in an amount that increases as an employee's time with the company lengthens; if an employee becomes a new hire post-suspension, it is likely he will pay more for retiree health coverage than he would if the company credited all the years he actually worked there. Moreover, DTC concedes that Gates terminated Plaintiffs because they refused to sign an agreement that required them to acquiesce to reduced benefits. (*See, e.g.*, Docket No. 55 at 4–5). This evidence is sufficient, when viewed in the light most favorable to Plaintiffs, to allow a reasonable jury to conclude that DTC's intent to interfere with Plaintiff's ERISA rights was a motivating factor in the company's decision to terminate them.

The burden of persuasion thus shifts to DTC to "produce evidence supporting a legitimate, non-discriminatory reason for the discharge." *Crawford*, 560 F.3d at 614. DTC argues that Gates presented Plaintiffs with the Agreement of Suspension because he concluded they received money in connection with a widespread scheme to steal copper from the company. This is an ample non-discriminatory reason.

The burden of persuasion returns to Plaintiffs to show that DTC's rationale is in fact "a phony reason." *Id.* "[A] plaintiff can establish pretext by showing '(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his [discharge], or (3) that they were *insufficient* to motivate discharge.'" *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). "The first type of showing is easily recognizable and consists of evidence

that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are 'factually false.'" *Manzer*, 29 F.3d at 1084. "The third showing is also easily recognizable"; "ordinarily, [it] consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id*. But the "second showing," the court in *Manzer* held, "is of an entirely different ilk":

> There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal . . . . In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Id*. Making this type of rebuttal showing places an additional burden on the plaintiff, who "may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of [] discrimination." *Id*.

Here, Plaintiffs primarily rely on the first and second rebuttal modes to show that DTC's stated reason for demanding that Plaintiffs sign the Agreement of Suspension on pain of termination was pretextual. As to the first, the Court will consider whether Plaintiffs have produced evidence that would allow a reasonable jury to conclude that DTC had no factual basis to conclude they were stealing. And as to the second, the question is whether the strength of Plaintiffs' circumstantial evidence of DTC's allegedly improper motivations for interfering with Plaintiffs' attainment of ERISA benefits would permit a reasonable jury to conclude that those impermissible motives overwhelm DTC's non-discriminatory reasons. *Id*.

The story Young and Vaden tell essentially proceeds in two parts. The first is that Gates didn't have ample reasons to believe they were stealing. To begin with, Eddie Summers, the person who implicated them, could only say that he "believed that everyone on the line crew" knew about and was involved in copper theft; Summers specifically said he never saw any money change hands (except when he himself received money on one occasion). (Docket No. 44 at 2). Summers's account of Plaintiffs' complicity in the scheme was similarly speculative. Vaden, Summers reported, "said he didn't question where the money came from, but when there was talk of the copper money, [Vaden] said, 'Praise the Lord.'" (*Id*.). And as for Young, Summers reiterated that he only "believed" Young "knew about and received money from copper just like the others." (*Id*.). In other words, the chief accuser on whom Gates relied had no personal knowledge of the fact that Gates used to conclude Plaintiffs were stealing.

Not only did no one else apart from Summers inculpate them, but other employees suggested to the contrary that Plaintiffs' hands were clean. For example, Myers and Ervin—the two men DTC terminated after they admitted their role in the copper-theft scheme, and who presumably knew about other DTC employees' connection to the scheme—submitted declarations reporting that Plaintiffs were never involved in the sale of scrap copper. (Docket Nos. 57 at 1–2; 58 at 1–2; *Vaden*, No. 2:12-cv-105, Docket Nos. 53 at 1–2; 54 at 1–2). Myers and Ervin also said that they never told anyone at DTC otherwise. (*Id*.).

Finally, while DTC insists that Plaintiffs admitted to stealing—maintaining that "Young admitted that he received $700 from the sale of DTC copper" and that Vaden "suppose[d]" that $700 Young gave him came from copper, (Docket No. 60 at 6)—Plaintiffs vociferously deny the company's characterizations. Young's written statement, while it admits to receiving money from Myers, does not connect the receipt of the money to the sale of copper. (Docket No. 40-4

at 1). Moreover, Young stated in his deposition that Gates instructed Young to include facts in his written statement about which Young was unsure. (Docket No. 60-1 at 6–7). With respect to Vaden, he plainly denied ever receiving money from copper, insisting instead that he explicitly told Gates that he "never sold no copper, [] never seen nobody sell it, and [] never took any money from it." (*Vaden*, No. 2:12-cv-105, Docket No. 57-2 at 4).

The second leg Plaintiffs stand on to show that DTC's rationale for pushing the Agreement of Suspension on them was pretextual is evidence that senior management at DTC had known for years that someone on the line crew was involved in taking copper, and did nothing about it. The declaration of Randy Bogle, a former DTC manager, supports Plaintiffs' argument. Bogle says that in May 2010 he informed DTC's CEO, COO, and CFO on separate occasions that he suspected someone was taking the company's scrap copper to sell for personal gain. (Docket No. 59 at 1). Although DTC's management told Bogle that the company would call him to a meeting to discuss this further, no one ever followed up with him. (*Id*. at 2). Such evidence, Plaintiffs say, damages DTC's claim that the company began investigating Plaintiffs' role in the ring as a result of Ervin's arrest in December 2011; instead, it breathes life into the theory that DTC resurrected the years-old copper-theft allegations in 2012 as a means to reduce DTC's labor costs amid the company's financial struggles. To sustain the last point, Plaintiffs offer DTC's financial reports spanning the years 2005–2012, which show declining operational revenues and rising benefits costs, as well as Gates's deposition testimony concerning contractions in DTC's core industry. (Docket Nos. 38-2 at 8 (testimony explaining that DTC eliminated Plaintiffs' positions because "we're in the landline business" and "the industry as a whole is losing lines everday," so "[w]e don't have as much construction as we used to have"); 38-3 at 2–40 (DTC financial statements) (sealed docket entry)).

No doubt, the facts in this case are vehemently disputed. And it is in part due to the heat and intensity of the clash that the Court has little trouble concluding that Plaintiffs have provided sufficient evidence for a reasonable jury to find for them on their interference claim. A jury could well decide that DTC's reason for putting Plaintiffs to the choice of the Agreement of Suspension or termination was "phony" either because the factual basis on which DTC relied was not credible—and thus inadequate—or because an impermissible purpose motivated DTC more strongly than Gates's belief that Plaintiffs were complicit in theft from the company.

Even if the record raises factual questions as to Gates's motive, DTC nonetheless contends that its decision trying to get Plaintiffs to agree to the Agreement of Suspension because Gates concluded they were stealing is incontrovertible under the "honest belief" rule:

> Under [this] rule, an employer's proffered reason is considered honestly held where the employer can establish it reasonably reli[ed] on particularized facts that were before it at the time the decision was made. Thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held. An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact.

*Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 794 (6th Cir. 2006)) (alterations in original). The employer's decisional process doesn't have to "'be optimal or . . . le[ave] no stone unturned'"; instead, "'the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Id*. (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). That said, "[a]n employer's invocation of the honest belief rule does not automatically shield it," *id*. at 286, and the Court is not bound to "blindly assume that an employer's description of its reasons is honest," *Smith*, 155 F.3d at 807.

The honest-belief rule does not do the work DTC hopes here for two reasons. First, the Sixth Circuit has suggested that the rule operates to stand in the way of a plaintiff's ability to show pretext when he tries to do so under the first *Manzer* method (*i.e.*, by putting up evidence that the defendant's proffered reasons are factually false), 29 F.3d at 1084, but not the other two methods available to him. *See Joostberns*, 166 F. App'x at 795 n.5 ("The honest belief rule would not prevent Plaintiff from establishing pretext through methods other than the falsity of the reason offered."). This limitation makes sense. A defendant who maintains that he honestly believed the factual basis undergirding his decision to take an adverse action against a plaintiff does not answer a plaintiff who—travelling under the second *Manzer* method of showing pretext, 29 F.3d at 1084—concedes that the defendant's proffered factual basis *could* have motivated the adverse action, but did not *actually* do so because a separate, illegal motivation drove the defendant's decision instead. Of course, Plaintiffs have chosen this pretext-proving path here.

Second, even if DTC can seek shelter under the honest-belief rule in the abstract, the evidence in this case still leaves the company exposed. While DTC surgically lays out the particularized facts and circumstances that were before Gates when he concluded Plaintiffs were stealing from DTC, (Docket No. 67 at 4), Plaintiffs have presented evidence from which a jury could plausibly question the reasonableness of Gates's investigation and conclusion. As discussed above, the sole person who pointed the finger at Plaintiffs admitted he only "believed" they were involved, but had no personal knowledge of it one way or the other. (This same individual told Gates that "everyone" on the line crew was in on the scheme, but that turned out to be at least partly wrong, as two men who denied involvement in the scheme were let off the hook. (Docket No. 40-2 at 5)). No one else told Gates that Plaintiffs were in on it. And the

record does not suggest that Gates tried to figure out if anyone else knew of Plaintiffs' roles firsthand.

While DTC says over and over again that Plaintiffs admitted to stealing from the company, repetition doesn't make it true, as both Plaintiffs vigorously deny they were involved in copper theft.  In the end, a jury will have to conclude whether Gates's investigation was sufficiently reliable or reasonable to trigger the honest-belief rule.  *See Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 414 (6th Cir. 2008) (finding a question of fact as to the reasonableness of the employer's inquiry).  And more broadly, Plaintiffs have provided sufficient evidence for a reasonable jury to find for them on their interference claim.

*Retaliation claim*

Plaintiffs also assert that their termination violated § 510's anti-retaliation provisions.  As noted, ERISA § 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan[.]"  29 U.S.C. § 1140.  Again, Plaintiffs have not presented direct evidence of DTC's motivation in terminating them, so the Court applies "the familiar *Burdine* burden-shifting approach":  first Plaintiffs establish a prima facie case of retaliation, then DTC articulates a legitimate reason for Plaintiffs' termination; and finally Plaintiffs show that the articulated reason was a pretext for retaliation.  *Hamilton*, 522 F.3d at 628.  "To establish a prima facie case of retaliation under § 510, an employee must show that (1) she was engaged in activity that ERISA protects; (2) she suffered an adverse employment action; and (3) a causal link exists between her protected activity and the employer's adverse action."  *Id.*

Here, Plaintiffs claim that they engaged in protected activity when they refused to sign an agreement that would have prevented them from attaining benefits to which they would have become entitled. The adverse employment action each man endured was termination from his position at DTC. Evidence of the causal link between the two came directly from Gates, the decisionmaker. Speaking first of Vaden, Gates stated that he "offered Mr. Vaden an Agreement of Suspension. [Vaden] agreed not to agree to the suspension and terminated himself." (Docket No. 38-2 at 4). Gates was then asked if his position was that he "never did terminate Mr. Vaden or Mr. Young." (*Id*. at 5). He answered, "I terminated him when he would not take the suspension, if that's the way you want to word it." (*Id*.). Gates's statement that he terminated Plaintiffs because they refused to sign the Agreement of Suspension demonstrates the causal link Plaintiffs must establish to make out their prima facie case.

DTC's legitimate non-discriminatory reason for terminating Plaintiffs was Gates's conclusion that the two men were involved in the copper-theft scheme. This is sufficient to turn the burden back to Plaintiffs to demonstrate pretext.

Plaintiffs have presented sufficient evidence to allow a reasonable jury to conclude that DTC's stated rationale for their termination was pretextual. As Plaintiffs offer the same evidence concerning DTC's unlawful motivation to support both their interference and retaliation claims, and the parties do not suggest the evidence should be viewed differently when considering either claim, there is no need to rehearse the analysis again.

In this case, only a trier of fact who can assess the credibility of witnesses and weigh the evidence can decide DTC's motive for terminating Plaintiffs; the Court cannot do so on a motion for summary judgment. As a result, the Court denies DTC's motion for summary judgment on Plaintiffs' interference and retaliation claims under ERISA § 510.

*Plaintiffs' cross motion for summary judgment*

The analysis above—and especially the circumstantial evidence of DTC's intent supporting Gates's stated rationale—should make clear that Plaintiffs' cross-motion for summary judgment on Count III must be denied.  To grant summary judgment on Plaintiffs' interference claim, the Court would have to conclude that the evidence presented, viewed in the light most favorable to DTC, would *require* a reasonable jury to determine that an unlawful intent to interfere with Plaintiffs' attainment of benefits motivated Gates's decision to put Plaintiffs to the choice of signing the Agreement of Suspension or being terminated.  Granting summary judgment on Plaintiffs' retaliation claim would likewise necessitate finding that the evidence *only* supports the conclusion that DTC's intent to retaliate against Plaintiffs for their refusal to accede to the Agreement of Suspension motivated the company's decision to terminate Plaintiffs.  The evidence here paints in shades of grey and it will be up to a jury to figure out the side of the line on which it falls.  The Court denies Plaintiffs' cross-motion for summary judgment on Count III.

## Count IV:  state-law wrongful-termination claim

DTC alone moves for summary judgment on Plaintiffs' Tennessee common-law wrongful-termination claim, which alleges that their terminations violated public policy.  To hear Plaintiffs tell it, DTC terminated their employment because they refused to go along with the extortionate terms of the Agreement of Suspension, (*see, e.g.*, Docket No. 1 at 13), which DTC drew up to coerce Plaintiffs' property (*i.e.*, their employment) from them.  Because these acts meet the elements of extortion, and because extorting one's employees violates Tennessee law, Plaintiffs conclude DTC wrongfully terminated them in violation of public policy.  (Docket No. 56 at 12–13).  DTC frames Plaintiffs' claim differently.  The company reads Count IV to allege

that DTC attempted to force Plaintiffs to choose between termination and an illegal reduction or forfeiture of ERISA benefits, which Plaintiffs allege is against public policy. Viewed through DTC's prism, ERISA preempts Plaintiffs' wrongful-termination claim. (Docket No. 41 at 18–19).

Even if the Court accepts the legal theory as Plaintiffs spin it, and even if the Court puts aside the issue of ERISA preemption for a moment, the state-law claim still fails. While Plaintiffs assert that their right to work is a property interest in Tennessee that DTC cannot take from them by coercion, they offer no support for this broad proposition. Why Plaintiffs might have an unqualified property interest in their continued at-will employment—which, "[u]nder long-established Tennessee law," allows them to "be discharged without breach of contract for good cause, bad cause or no cause at all," *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 443 (Tenn. 1984) (citing *Payne v. W. & Atlantic R.R. Co.*, 81 Tenn. 507 (1884))—they do not explain. Nor do Plaintiffs offer what limits there might be to the notion that, say, a reduction in compensation that an employer imposes on an at-will employee on pain of termination is a coercive deprivation of a protected interest that amounts to extortion. These are just two of several questions that can be raised to probe Plaintiffs' claim; in a sense, however, they are beside the point because Plaintiffs have not cited any authority that supports the capacious position they push. Plaintiffs' failure entitles DTC to judgment as a matter of law on Count IV.

**Motions to strike**

Finally, the Court addresses two additional requests the parties make. First, DTC asks the Court to strike Plaintiffs' summary-judgment filings because they are too long and because Plaintiffs did not properly file confidential materials under seal. (Docket No. 48). The first basis does not trouble the Court here; Plaintiffs concede the second was a mistake, (Docket No. 51 at 4

n.4), that the Magistrate Judge has already corrected, (Docket No. 46). The Court denies DTC's motion to strike.

Plaintiffs respond in kind and ask the Court to strike Gates's declaration that DTC filed with its motion for summary judgment and its response to Plaintiffs' cross-motion. Plaintiffs read the declaration to contradict Gates's earlier deposition testimony, which may be impermissible if the later testimony is used to create a triable issue of fact. (Docket No. 65). Plaintiffs object that while Gates said in his deposition that he terminated them because they refused to sign the Agreement of Suspension, Gates said in his later-filed declaration that he dismissed Plaintiffs because he concluded they were stealing. (*Id*. at 2–4). Plaintiffs point out (correctly, for what it's worth) that Gates never used the word "steal" in his deposition and never suggested that he terminated Plaintiffs due to any alleged theft. (*Id*. at 4). They concede, however, that Gates had earlier posited that Plaintiffs had accepted money from the sale of pilfered copper. (*Id*. at 4-5).

The record does not support the distinction Plaintiffs strain mightily to make. The Court must view Gates's deposition testimony and his declaration in the light most favorable to DTC when considering Plaintiffs' cross-motion for summary-judgment on their § 510 claim, which is the claim on which the declaration bears. And a fair reading of that evidence certainly supports the inference that Gates earlier disclosed his belief that Plaintiffs were involved in the copper-theft scheme. The Court denies Plaintiffs' motion to strike.

<u>CONCLUSION</u>

For the reasons discussed, the Court will

- DENY Plaintiffs' motion for summary judgment as to their ERISA § 510 claim (Count III), (Docket No. 34; *Vaden*, No. 2:12-cv-105, Docket No. 33);

- DENY Plaintiffs' motion for summary judgment as to their severance claims (Counts I & II), (Docket No. 36; *Vaden*, No. 2:12-cv-105, Docket No. 37);

- GRANT Defendant's motion for summary judgment as to Plaintiffs' severance claims (Counts I & II), DENY it as to Plaintiffs' ERISA § 510 claim (Count III), and GRANT it as to Plaintiffs' state-law wrongful-termination claim (Count IV), (Docket No. 40; *Vaden*, No. 2:12-cv-105, Docket No. 41);

- DENY Defendant's motion to strike Plaintiffs' summary-judgment filings, (Docket No. 48; *Vaden*, No. 2:12-cv-105, Docket No. 48); and

- DENY Plaintiffs' motion to strike the declaration of Craig Gates, (Docket No. 65; *Vaden*, No. 2:12-cv-105, Docket No. 62).

An appropriate Order will be entered.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE